UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLOOMFIELD HILLS COUNTRY CLUB,
BIRMINGHAM COUNTRY CLUB, and                    Case No. 15-11290
BYLEN GOLF COMPANY, L.L.C. d/b/a
PINE TRACE GOLF CLUB,                           Honorable Nancy G. Edmunds

       Plaintiffs,

v.

THE TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, PHOENIX
INSURANCE COMPANY, and TRAVELERS
INDEMNITY COMPANY OF AMERICA,

       Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO EXCLUDE THE
EXPERT REPORT AND TESTIMONY OF DR. JOSEPH VARGAS [39]**

      Defendants bring this motion to exclude the expert report and testimony of Dr. Joseph

Vargas. (Docket 39.) Plaintiffs filed a response (dkt. 53)[1] and Defendants filed a reply (dkt.

45). The Court heard this matter on August 17, 2016.

**I.    Background and Facts**

      This is a first-party property damage claim. Plaintiffs are three golf courses in metro-

Detroit: Bloomfield Hills Country Club ("Bloomfield"), Birmingham Country Club

("Birmingham") and Bylen Golf Company, LLC, d/b/a Pine Trace Golf Club ("Pine Trace";

together "Plaintiffs" or "Plaintiff golf courses"). On April 1, 2013, Defendant Travelers

---

    [1] Upon Stipulation and Order, Plaintiffs withdrew their first filed Response, which was
at docket 43, and filed the current response at docket 53.

Property Casualty Company of America, issued a policy of insurance to Bloomfield. On October 1, 2013, Phoenix Insurance Company issued a policy of insurance to Birmingham. On January 1, 2013, Travelers Indemnity Company of America issued a policy of insurance to Pine Trace. There is no dispute that the policies were in effect throughout the 2013-2014 winter. Each Plaintiff purchased, at an additional cost, the Eagle 3 Miscellaneous Property Coverage ("Eagle 3 form"), which provided: "We will pay for direct physical loss of or damage to Covered Property caused by or resulting from Covered Cause of Loss." (Eagle 3 Misc. Prop. Coverage § A, dkt. 53-1.) Covered Property includes "Golf Course Greens, Tees, Fairways and Rough," and provides as a Covered Cause of Loss "Weight of snow, ice or sleet." (Eagle 3 Misc. Prop. Coverage § A.3.b(13), dkt. 53-1.)

Plaintiffs allege that during the winter of 2013-2014, thick heavy ice accumulated on the greens at Plaintiff golf courses, allegedly 5 inches thick in some locations. (Photos., Pls.' Resp. Ex. 2, dkt. 53-1.) Plaintiffs allege that the weight of this ice killed the turfgrass by prohibiting a gaseous exchange by the turfgrass, leading to anoxia, as opined by Plaintiffs' expert, Dr. Joseph M. Vargas Jr.

Plaintiffs submitted claims to Defendants for coverage pursuant to the Eagle 3 form for the winterkill damage to the greens. Defendants denied coverage on the basis that the weight of the ice did not kill the greens. Plaintiffs filed suit on April 6, 2014. (Dkt. 1.) In addition to filing motions for summary judgment, Defendants seek to exclude Dr. Vargas's opinion and testimony.

## II.   Analysis

### A. Whether Plaintiffs' Expert Dr. Vargas's Report And Testimony Satisfy *Daubert's* Reliability Requirement

Courts considering expert testimony examine admissibility within the context of Federal Rule of Evidence 702.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The United States Supreme Court has established that Rule 702 requires district courts to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (expanding *Daubert's* analysis of expert scientific testimony to cover expert testimony based on "technical" and "other specialized knowledge"). Rule 702 "imposes a 'gatekeeping' duty on district courts [to] exclude unreliable and irrelevant evidence." *Meemic Ins. Co. v. Hewlett–Packard Co.*, 717 F.Supp.2d 752, 761 (E.D. Mich. 2010) (Edmunds, J.) (citation omitted).

In its gatekeeping role, the Court is to consider the basis of an expert's opinion by evaluating: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate and the existence and maintenance of standards controlling the technique's operation; (4) whether it is generally accepted in a particular field; (5) "whether the experts are proposing

3

to testify about matters growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying because the former provides important, objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk So. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (citations and internal quotations omitted), *abrogated on other grounds by Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998).

An expert opinion that is based on scientifically valid principles will satisfy Rule 702, while an expert's subjective belief on unsupported speculation will not. *See Smelser*, 105 F.3d at 303. Courts are not required to admit opinions or conclusions that are "connected to existing data only by the *ipse dixit* of the expert." *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The party offering expert testimony must prove its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10.

Dr. Joseph M. Vargas Jr. is a professor of plant, soil and microbial ecology (plant pathology) at Michigan State University, where he has 48 years of teaching experience in plant pathology and has maintained teaching, research and extension responsibilities in turfgrass pathology, resistance to fungicides, and biological control. (Vargas CV, Pls.' Resp. Ex. 3, dkt. 53-1). Plaintiffs offer Dr. Vargas's report in the form of a letter dated December 16, 2015, containing his opinion, as well as his deposition testimony in support of his opinion, and Defendants seek to exclude them on the grounds that they fail to satisfy *Daubert's* reliability requirement. Defendants argue that the opinion is not based upon factual information relating to the conditions experienced at the Plaintiff golf courses, there

is no authoritative support for Dr. Vargas's opinion, and his opinion is nothing more than *ipse dixit*.

Dr. Vargas's report includes the following opinion:

It is my opinion that the damage to the greens at Bloomfield Hills Country Club, Birmingham Country Club and Pine Trace Golf Club that occurred during that winter of 2013-2014 was directly caused by the weight of the ice on the greens prohibiting gaseous exchange with the surface.[2]

(Vargas Letter Dec. 16, 2015, Defs.' Mot. Ex. 2, dkt. 39-2.) Dr. Vargas confirmed in his deposition that this was and remains his opinion. (Vargas Dep. 31:18-32:18, Defs.' Mot. Ex. 1, dkt. 39-1.) Dr. Vargas also agreed that he stated this opinion to a reasonable degree of scientific certainty. (Vargas Dep. 33:6-8; dkt. 39-1.) Dr. Vargas's expert report and testimony include a discussion of "anoxia," which he defined as "technically . . . the lack of oxygen in -- in an environment." (Vargas Dep. 38:25-39:2, dkt. 39-1.) He included the following discussion regarding how it occurs and how the weight of ice can cause it:

*Poa annua* is susceptible to damage under ice cover. The two most common forms of injuries are crown hydration and anoxia or the lack of oxygen which eventual (sic) leads to the production of two toxic gasses, ethyl butyrate and butanol. Dr. James Beard conducted a controlled laboratory experiment (1) showing the death of the Poa annua was beginning to occur after 60 days of ice cover with even more death around 75 days. Whereas a Canadian field study showed only 45 days was necessary for the death of the Poa annua to occur (2). The death of the *Poa annua* that occurs under continuous ice cover is believed to be primarily due to anoxia caused by the plants continuing to respire and produce $CO_2$ eventually eliminating the oxygen. This is then followed by anaerobic bacteria producing gases like butanol and ethyl butyrate which are toxic to the annual bluegrass (3,4).

---

[2]   Dr. Vargas's report further stated, "The facts and data I considered in forming my opinions include: my experience, as indicated in my attached CV; the reference materials footnoted in this report; the documents and reports of John Kaminski; and the documents and pictures included in Plaintiffs' responses to Defendants' discovery requests." (*Id.*) As Defendants point out, footnotes were not included. (dkt. 39-2.)

5

Snow covered greens and greens with light, porous ice are able to exchange gases with the surface air and under these conditions remain aerobic and there is minimal if any turf loss. However, when the ice becomes too thick and heavy on the greens there is no gaseous exchange with the surface. When the ice layer is thick and heavy, as occurred in the winter of 2013-2014, the weight of the ice presses against the surface of the green resulting in limited space for air between the green and the ice and the system soon becomes anaerobic. The heavier the ice the less area there is for oxygen to occur and the sooner the system becomes anaerobic. The Kaminski report indicated that there was between 3 to 5 inches of ice on the Greens at Bloomfield Hills Country Club. I observed similar thickness of ice layers on the golf courses I visited.

(Vargas Letter, Dec. 16, 2015, dkt. 39-2.)

Plaintiffs do not dispute and the Court agrees that Dr. Vargas's testimony reflects "scientific knowledge." Further, Defendants do not argue that Dr. Vargas is not "qualified" to offer opinion testimony. As agreed at the hearing, there is no dispute that Dr. Vargas's testimony, if reliable, would be relevant. Defendants instead argue that the topics covered by Dr. Vargas relate to scientific issues and principles, yet Dr. Vargas testified in the negative when asked whether there was authoritative support for aspects of his opinion, and whether he could identify peer-reviewed research results, scientific articles, and other scientific evidence to support his opinion that the weight of ice caused anoxia and caused damage to the greens. (Defs.' Mot. 7-8, dkt. 39; Vargas Dep. 34:13-38:24, dkt. 39-1.) Plaintiffs admit that "it is true there is no authoritative literature supporting Dr. Vargas'[s] opinion that the weight of the ice on the greens caused their death by anoxia, there is also no authoritative literature refuting this opinion. . . . [T]he literature is simply silent on this issue." (Pls.' Resp. 4, dkt. 53.) Of those factors which the Court should evaluate, for example, whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; its known or potential error rate and the existence and maintenance of standards controlling the technique's operation; and  whether it has

6

attracted widespread acceptance in a particular field, Dr. Vargas does not provide this information in support of his opinion.

Yet the "test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997) (emphasis in original). "*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.' And *Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Id.* at 150 (citations and quotations omitted). *Kumho* makes clear that the court can "neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, . . . . Too much depends upon the particular circumstances of the particular case at issue." *Id.* Further, as set forth in *Daubert*,

> "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence-- especially Rule 702-- do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

*Daubert*, 509 U.S. at 597.

Plaintiffs argue that under these standards, the lack of scientific literature to support Dr. Vargas's opinion is not fatal, and Plaintiffs' primary argument, in bold in their response brief, is that "Dr. Vargas'[s] reliance on his personal experience, in light of no supporting or refuting authoritative literature on this issue, complies with Daubert and MRE (sic) 702, and does not form the basis to strike his testimony." (Pls.' Resp. 6); *see also Daubert*, 509

7

U.S. at 598 (the Court noting that the "inquiries of the District Court and the Court of Appeals focused almost exclusively on 'general acceptance,' as gauged by publication and the decisions of the other courts," and vacating and remanding for further proceedings). Plaintiffs argue that trained experts like Dr. Vargas commonly extrapolate from existing data and may properly do so. *See e.g., General Electric v. Joiner*, 522 U.S. 136, 146 (1997).

In support of Dr. Vargas's methodology, Plaintiffs point out that he had inspected ice on the greens of three other Metro-Detroit golf courses during the 2013-2014 winter, and "[t]here was a foul odor coming out from under the ice as it was being removed indicating an anaerobic condition had occurred." (Vargas Letter, Dec. 16, 2015, dkt. 39-2.) In his letter opinion, Dr. Vargas noted that at these other courses, the damaged areas mirrored where the ice was present, and it was 'not typical of crown hydration damage where the annual bluegrass emerges from under the ice appearing to be healthy." (*Id.*) In an affidavit, Dr. Vargas further testified that at these other courses, the "foul odor indicated an anaerobic condition had occurred, which was anoxia of the turfgrass from the weight of the ice on the greens." (Vargas Aff. ¶ 6, Pls.' Resp. Ex. 8, dkt. 53-1.) Dr. Vargas also testified as to the basis for his opinion:

> Q. Is your opinion just based upon what you believe based upon your years of experience?
>
> A. Yes.
>
> Q. Have you performed any repeatable study or experiment which supports your opinion?
>
> A. No.
>
> Q. Are you aware of anyone else who has performed a repeatable study or experiment which supports that opinion?

A.  No.

. . . .

Q.  Can you explain the process that you followed in arriving at your opinions with regard to these specific three golf courses?

. . . .

A.  Okay. All right. First, I went to, you know, three different courses, okay, and observed how thick and heavy the ice was, okay, and formed my opinion actually there. And then I was shown the pictures of Bloomfield Hills, Birmingham, and Pine Trace, and it was very similar to what I observed at the three courses that I went to. So based on that, my opinion was that it died, also, that they died also from the heavy ice on top of the turf and the anoxia that occurred underneath there.

Q.  And what is it about the pictures you looked at as to these three golf courses that led you to this opinion?

A.  The fact that in many cases the entire green was dead, okay, number 1. There was -- including the creeping bentgrass, okay, that was in it; and, I guess, number 2, there just wasn't any green grass there when the ice was finally removed.

Q.  Yeah, but those two things you described, first, in many instances the entire greens were dead, and second, there wasn't any green grass there when the ice was finally removed, couldn't those conditions be present just by virtue of the existence of anoxia, but not necessarily with respect to the weight of the ice causing anoxia?

. . . .

A.  It was an -- anoxia did kill the greens, okay, and I guess I believe it was because of the -- you know, the weight or heaviness of the ice that limited any gaseous exchange, but –

(Vargas Dep. 34:13-38:24, dkt. 39-1.)

Plaintiffs also rely on the opinion of Dr. Kevin Frank, Associate Professor at Michigan State University, as consistent with Dr. Vargas's; Dr. Frank stated his belief that "weight of ice is a directly correlated factor in causing winterkill." (Frank Letter July 22, 2014, Pls.' Resp. Ex. 6, dkt. 53-1.) They argue that this shows that Dr. Vargas is not the only turfgrass expert who believes the weight of ice can and did cause winterkill to Michigan golf courses

9

by anoxia. (Pls.' Resp. 5.) Plaintiffs also allege that the rarity of such a severe ice event

contributes to the lack of scientific literature on this issue, as Dr. Vargas testified:

> Q. So have you seen other examples of where golf courses have had their greens damaged by anoxia in years other than the '13-'14 winter?
>
> A. Yes, and it was way back. I think it was either 1980 or '81. We had a big ice storm on New Year's Eve, and it left 3, 4, 6 inches of ice everywhere on the greens throughout this area.
>
> Q. So it was the only other time that you've personally observed --
>
> A. Yes.
>
> Q.      -- anoxia--
>
> A. Anoxia.
>
> Q. -- damage to greens?
>
> A. Yes.

(Vargas Dep. 73:24-74:12.)

To the extent that Defendants point out that Dr. Vargas had not observed the Plaintiff

golf courses in person, this alone is not fatal Dr. Vargas's opinion. Plaintiffs show that Dr.

Vargas had documentation about the greens of the actual courses at issue on which to

base and from which to infer his opinion. For example, in his letter opinion, he notes that

"[t]he Kaminski report indicated that there was between 3 to 5 inches of ice on the greens

at Bloomfield Hills Country Club," and that Dr. Vargas has observed similar thickness of ice

layers on the golf courses he had visited. (Vargas Letter Dec. 16, 2016, dkt. 39-2.) Experts

are permitted to opine even without firsthand knowledge or observation as long as, "the

expert's opinion [has] a reliable basis in the knowledge and experience of his discipline."

*Daubert*, 509 U.S. at 592.

Despite the possibly novel opinion Dr. Vargas reaches, his opinion is based on over 40 years of teaching about and experience with plant pathology including winterkill in turfgrass, and his extrapolation of the information he had about Plaintiffs' golf courses. The Court finds that Dr. Vargas made an allowable inference from this information, and his opinion is reliable, relevant and admissible.

### B. Whether Dr. Kaminski's Report Demonstrates that Dr. Vargas's Report Is Unreliable

Defendants argue that their own expert Dr. Kaminski's report demonstrates that Dr. Vargas's investigation was flawed and incomplete, and he failed to address research relevant to the issue of the weight of ice causing anoxia. (Defs.' Mot. 18.) Defendants argue that Dr. Kaminski's report discusses evidence that the greens at Plaintiff golf courses were encased in ice during the 2013-2014 winter, and that Dr. Vargas had testified that he did not know whether they were encased in ice and agreed that "if they were encapsulated" maybe the explanation in his report would not still apply. (Vargas Dep. 92:16-23.)

Dr. Kaminski also relies on a 2009 study in which the author "reported that the buildup of toxic gases butanol and ethylbutyrate resulted in the loss of annual bluegrass in an experiment with no ice. Their research involved the use of 'simulated ice cover' in which they covered plants with plastic bags and removed all oxygen. . . . The authors reported death of the annual bluegrass in as few as 25-30 days. . . . This study . . . , further verifies that weight of ice is not a contributing factor as they subjected the plants to anoxia in the absence of ice and therefore any weight pushing down on the plant." (Kaminski Report, Apr. 15, 2016, at 5, dkt. 39-3.) As Plaintiff points out, Dr. Kaminski's contradicting opinion

goes to the weight of Dr. Vargas's opinion and testimony, not its admissibility, and is not

a reason to exclude Dr. Vargas's testimony.

## III.   Conclusion

For the reasons set forth herein and on the record, the Court DENIES Defendants'

Motion to Exclude The Expert Report and Testimony of Dr. Joseph Vargas (dkt. 39).

**SO ORDERED**.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge


Dated:  August 30, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record
on August 30, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager